IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JIMMY D. BRINDLEY ) | |
| ) | |
| v. ) | No. 3:13-1095 |
| ) | Judge Trauger/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:   The Honorable Aleta A. Trauger, District Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 10), to which defendant has responded (Docket Entry No. 14-1). Plaintiff has further filed a reply brief (Docket Entry No. 16). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 9),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

### I.  Introduction

Plaintiff filed his claim to benefits on April 29, 2010, alleging that he became disabled on November 15, 2009, as a result of his injuries to both shoulders resulting in torn

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

rotator cuffs. (Tr. 19, 151) His claim was denied at the initial and reconsideration stages of state agency review, whereupon plaintiff filed a request for *de novo* hearing and decision by an Administrative Law Judge (ALJ). An administrative hearing was held on March 8, 2012, at which plaintiff appeared with counsel. (Tr. 34-72) Plaintiff testified, as did an impartial vocational expert. At the conclusion of the hearing, the ALJ closed the record and took the matter under advisement, until May 14, 2012, when he issued a written decision in which plaintiff was found to be not disabled. (Tr. 19-27) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity (SGA) since November 15, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative joint disease of both shoulders (torn rotator cuffs, status-post repair surgery on the non-dominant left) (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except for a maximal lift/carry capacity of 10 pounds and no overhead reaching with either arm.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on September 24, 1961 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age upon attaining the age of 50 (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. The claimant has no transferable skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 15, 2009, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 21, 23, 25-27)

On August 5, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. <u>Id.</u>

## II. Review of the Record

The following summary of the record is taken from plaintiff's brief, Docket Entry No. 11 at 2-10.

Plaintiff Jimmy Brindley was born on September 24, 1961, and is now [53] years old. He was 48 years old on his alleged disability onset date, November 15, 2009. <u>See</u> Tr. 25, 147. As such, he was a younger individual under the regulations at the time of his alleged onset date, and later changed age categories to an individual closely approaching advanced age.

Mr. Brindley has received his primary care treatment from Dr. John M. Byrnes since at least 2005. Tr. 394-416. Medical records document his treatment for hypertension,

depression, anxiety, sinus difficulties, and fractured right ulnar and some fractured ribs. Id.

On November 15, 2009, Mr. Brindley presented to the emergency department at Stones River Hospital after being attacked, unprovoked, by his own German Shepherd dog. See Tr. 301-306. It was later determined that his dog had been trained as a police attack dog, but it had been eliminated as unfit for police work. Tr. 44, 46.

After his initial treatment through the emergency department, Mr. Brindley presented to Dr. Roy Terry on December 9, 2009, related to his persistent difficulties with his upper extremities after the dog attack. Tr. 307. X-rays revealed no fractures, although hairline fractures may have already shown some healing. Id. Treatment notes show that he had some fatigued pain of the left wrist, scar tissue and trauma from crush injury, very tender overhead motion, decreased strength, and positive Hawkins test indicating the need for bilateral MRI for evaluation of the shoulders. Id.

Mr. Brindley then saw his primary care physician, Dr. Byrnes, on February 9, 2010. Tr. 328. Dr. Byrnes made a diagram of Mr. Brindley's upper body showing the bite marks and injuries. Id. He also noted "difficult lateral[] movement," as well as some other notes regarding upper extremities limited movement and other difficulties. Id. (emphasis original). A note from February 10, 2010, shows Dr. Byrnes referred Mr. Brindley to an orthopedist, Dr. Robert Greenburg. Tr. 327. On March 8, 2010, Dr. Byrnes noted that Mr. Brindley's right foot was tender and swollen, and he was assessed with gout. Tr. 326. Assessments on April 29, 2010, also included gout, as well as hypertension and hyperlipidemia. Tr. 325. On June 24, 2010, Dr. Byrnes noted Mr. Brindley's "severe bilateral shoulder injuries," as well as hypertension, depression and anxiety. Tr. 324.

On [February] 22, 2010, Mr. Brindley presented to Dr. Greenberg, the orthopedist Dr. Byrnes referred him to. Tr. 310-311. X-rays of the right shoulder showed some AC joint arthrosis and an inferior spur likely related to some early arthritis, a type II acromion irregularity over the tuberosity, and a few millimeters of proximal migration on the right shoulder. Id. The left shoulder also revealed some proximal migration, AC joint arthritis, no glenohumeral changes, and a type I acromion. Id. Mr. Brindley reported persistent weakness and pain of his bilateral shoulders, worse on the right, and objective examination revealed significant weakness of both shoulders, inability to reach his arms over his head or out to the side, and difficulty supporting the weight of both arms. Id. Dr. Greenberg assessed him with possible bilateral rotator cuff tears, right shoulder osteoarthritis, and bilateral impingement, and ordered MRIs of both shoulders. Id.

The MRIs were performed on March 3, 2010, and the left shoulder revealed full

4

thickness rupture of the supraspinatus tendon with 2.1 cm retraction to the superior aspect of the humeral head, a moderate amount of fluid within the subacromial/subdeltoid bursa extending from the joint compartment, mild acromioclavicular hypertrophy, and degenerative superior labrum. Tr. 317. The MRI of the right shoulder revealed similar findings, including a moderate full-thickness tear of the supraspinatus tendon, high grade partial thickness articular surface [tear] greater than 50% of the infraspinatus tendon, moderate severity tendinopathy of the subscapularis tendon, and a tear of the superior labrum extending from the level of the biceps anchor into the posterosuperior labral quadrant. Tr. 318.

In March 2010, Dr. Greenberg again noted Mr. Brindley's very limited range of motion of both shoulders with weakness, grinding and crepitus more on the left than the right (although he had more pain on the right), and palpable spurs over both AC joints. Tr. 312. He also noted that there were "fairly impressive" degenerative changes at the AC joint of both shoulders with severe tendinopathy on the right. Id.

On August 12, 2010, Mr. Brindley was treated by Dr. Byrnes related to limb pain and altered mental status related to his not thinking clearly, sleepiness with eyes closed, and not socializing. Tr. 387-388. He was also noted to have swelling of his feet and legs, and was referred to the emergency room. Id. Mr. Brindley then presented to the emergency department on August 12, 2010, with severe fatigue, confusion, slow and slurred speech, lethargy, and headache. Tr. 338-348. He was diagnosed with weakness, acute cephalgia, and stress/anxiety reaction. Tr. 339.

On August 13, 2010, Dr. Frank Pennington reviewed Mr. Brindley's file and assessed him with limitations to a reduced range of light work. Tr. 352-360. Specifically, Dr. Pennington limited him to only frequent pushing/pulling with the bilateral upper extremities, no overhead reaching or handling, and only frequent reaching and handling in all other directions, as well as only occasional postural [activities] (except never climbing ladders, ropes or scaffolds). Tr. 353-355, 359.

Mr. Brindley returned to Dr. Greenberg on August 18, 2010, and examination again revealed very weak 4/5 type strength of both shoulders and, in fact, it was not quite a drop arm on the left side, but he had difficulty raising the arm up without cheating. Tr. 382. He shrugged the shoulder and kept it close to his body and then used his deltoid to power up, and he had deep pain with some grinding particularly on the left side. Id. Dr. Greenberg recommended fixing the left side first because it was more painful and potentially the larger tear. Tr. 382-383. He also had a long discussion with Mr. Brindley about the details of the procedure, **the risks of recurrence, and very likely not having full return of function**. Tr.

5

383 (emphasis added).

He next saw Dr. Brindley on October 1, 2010, and Dr. Brindley again noted very weak 4/5 strength and some element of 3/5 strength, nearly a drop arm on the left side (inability to raise more than about 40-50 degrees in forward elevation and abduction, weakness with both supraspinatus/empty can testing, and difficulty holding the arm up in an elevated position. Tr. 376. The risk of re-tearing his rotator cuff was reiterated, and surgery on his left shoulder was scheduled. Tr. 376-377.

Surgery was performed on Mr. Brindley's left shoulder on October 12, 2010, with postoperative diagnoses of left shoulder rotator cuff tear, impingement, AC joint arthrosis, degenerative labral tear, and biceps tear. Tr. 439. It was specifically noted that his biceps was completely disrupted and retracted and obviously not repairable. Tr. 442. Treatment notes from October 22, 2010, note that he had been unable to tolerate his pain medications, including Percocet, Lortab and mepergan, and he was having some element of panic attack or anxiety reaction. Tr. 438. Dr. Greenberg recommended starting physical therapy, but he noted that it would be difficulty for Mr. Brindley to tolerate this more than two days per week. Id.

On October 18, 2010, Mr. Brindley presented to Stones River Hospital with anxiety, left arm pain, chest tightness and shortness of breath. Tr. 498, 500. He was diagnosed with panic disorder without agoraphobia, generalized anxiety disorder, abnormal electrocardiogram, hypertension and hyperlipidemia. Tr. 497.

Treatment notes from November 2010 again noted that he ended up with some abnormal reaction every time he tried narcotic medication. Tr. 437. In January 2011, Dr. Greenberg again noted some weakness and pain, as well as some element of cubital tunnel syndrome with tingling and positive Tinel sign over the ulnar nerve. Tr. 435. Dr. Greenberg stated that he was basically progressing as expected. Id.

Mr. Brindley presented to Care Here clinic in January 2011 with complaints of inability to work or support his family, loss of desire to participate, isolating, loss of interest, depressed, increased rumination/worry, obsesses, irritability, hypersomnic, and feeling like he was getting worse despite prescription medications. Tr. 445. By April 2011, his dosage of cymbal[ta] was doubled, and he continued to complain of increasing shoulder pain bilaterally (left worse than right) and felt physical therapy was not helping. Id. It was noted that he had "tried to work but [was] unable to lift/grasp objects due to pain." Id. He also reported increasing irritability, agitation, depression, and helplessness, as well as suicidal thoughts. Id. He returned later that month requesting pain medications due to his persistent symptoms,

6

and he reported inability to flex his left arm without it twitching. Tr. 444.

On March 8, 2011, Brad Bland, the treating physical therapist, wrote a letter regarding Mr. Brindley's progress, and he noted that overall function is still very limited due to pain and stiffness. Tr. 457. Mr. Bland noted that he was becoming frustrated with his pain level and functional limitations. Id. Mr. Bland also noted that he was concerned with noncompliance with exercises, but that Mr. Brindley was having difficulty with some active-assistive stretching due to pain in the non-surgical shoulder. Id. Finally, he noted that passive range of motion was limited by joint tightness and pain. Id. See also Tr. 458-480.

In March 2011, he was again noted to have weakness, limited range of motion, tightness and pain. Tr. 434. Dr. Greenberg noted some problems with compliance with physical therapy, but he noted that given the size and quality of his tissue and his slow start, the end point is truly unpredictable. Id. In May 2011, he again returned to Dr. Greenberg, and notes state that he had a bad problem in the sense that he was not progressing and his desire to work was certainly understandable. Tr. 432-433. Dr. Greenberg stated that he still describes pain causing inability to work, and he "certainly has been in a difficult situation because he was unable to do much work at all before the surgery and now afterwards he is really not much improved." Tr. 432. He further stated that Mr. Brindley's "other shoulder also is very limiting because of the rotator cuff tear, but in no sense is he ready to have the other side done." Id. Dr. Greenberg continued, stating that "unfortunately he has had the maximum amount of exercise and effort... There is not much more I can say or coach or even advise. I have really maximized all my potential options for him. The one thing I offer is seeing another surgeon." Id.

Dr. Kanika Chaudhuri reviewed the file on February 20, 2011, and provided an updated opinion regarding Mr. Brindley's limitations. Tr. 421-430. Dr. Chaudhuri limited him to sedentary work with no overhead reaching bilaterally, but this opinion failed to address the additional limitations from Dr. Pennington's opinion which were omitted from this assessment. Id.

Subsequent treatment notes from Mr. Bland in April 2011 show Mr. Brindley's complaints of continued, severe pain, as well as coldness and numbness in his hands. Tr. 451. Mr. Bland noted that his pain level and decreased function were worse than expected, even with [only] fair compliance. Id. He further stated that he had concerns of some nerve damage from the dog bites causing some of the numbness and coldness of his hands. Id. It was noted about a week later that his shoulder pain kept him up at night, and he continued to have very limited function with severe pain. Id.

7

In August 2011, Mr. Brindley again saw Dr. Byrnes, and it was noted that he had constant pain in his right shoulder, as well as continued difficulties with his left shoulder. Tr. 483.

On February 22, 2012, Mr. Brindley again presented to Care Here clinic with complains of exhaustion, nerve pain down his left shoulder to fingers with tingling/numbness, and trembling in both upper extremities. Tr. 444.

On February 27, 2012, Dr. Byrnes completed a medical source statement limiting Mr. Brindley to lifting and/or carrying less than 10 pounds frequently or occasionally, standing and/or walking less than 2 hours in an 8-hour workday, must periodically alternate sitting and standing to relieve pain or discomfort, and limited reaching in all directions, handling, fingering and feeling. Tr. 488-495. Dr. Byrnes also stated that he cannot lift either hand or arm above head or shoulder, he has continuous pain, and both hands/arms/forearms cannot be lifted or manipulated. Tr. 489, 491. Finally, Dr. Byrnes noted that he also has high blood pressure, anxiety, and depression. Tr. 494.

Dr. Byrnes subsequently [(on February 14, 2013, nine months after the ALJ decision in this case)] provided an Affidavit stating that his initial opinion contained errors, with the correct responses as follows: rare climbing ramps/stairs; never climbing ladders/ropes/scaffolds, occasional balancing due to pain with movement of his arms, and occasional stooping due to inability to use his hands and arms to provide balance or support to stoop, and increased pain anytime his arms hang. Tr. 218-220.

[The following instances of treatment were not documented and available in time for consideration by the ALJ, and so are not relevant to this Court's review, but are included for the sake of completeness.] Mr. Brindley returned to Dr. Byrnes on May 2, 2012, and he was noted to have left finger numbness, difficulty raising his shoulder, and pain and numbness of the bilateral shoulders/arms. Tr. 509. He was also treated for high blood pressure, anxiety, depression, gout, hyperlipidemia, and insomnia. Id. He was again noted to have decreased strength and range of motion of the shoulders in October 2012, left worse than right. Tr. 510. He was also noted to have chronic pain, severe depression, right knee locking, high blood pressure, generalized anxiety disorder, and continued upper extremity problems. Id.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found

> to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

(S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff alleges error in the ALJ's findings related to the weight given Dr. Byrnes' opinion, the credibility of plaintiff's subjective complaints, and the determination of plaintiff's RFC. For the reasons given below, the undersigned finds no error in the ALJ's decision.

Dr. Byrnes, plaintiff's primary care physician, completed a checkbox assessment form on February 27, 2012 (roughly one week before plaintiff's hearing) wherein he opined that plaintiff was limited to lifting and/or carrying less than 10 pounds frequently or occasionally, could stand and/or walk less than two hours out of an eight-hour workday, must alternate sitting and standing in order to relieve pain or discomfort, and was limited in reaching (in all directions), handling, fingering, and feeling. (Tr. 488-95) Dr. Byrnes further indicated that plaintiff could frequently stoop, balance, and climb ramps or stairs; and, notably, that he could frequently climb ladders, ropes, or scaffolds. (Tr. 490) Dr. Byrnes explicitly based these exertional, manipulative, and postural limitations on plaintiff's severe functional loss and pain owing to his significant shoulder injuries, citing reports from plaintiff's orthopedic surgeon, Dr. Greenberg.

11

The medical opinion of a treating source is entitled to controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2) if it is well supported by objective, clinical evidence and not substantially opposed on the record. Even where such an opinion is not entitled to controlling weight, the Sixth Circuit has stated that "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference. . . ." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007). Accordingly, ALJs must provide "good reasons" for discounting the weight of a treating source opinion. See 20 C.F.R § 404.1527(d)(2); Rogers, 486 F.3d at 242. The ALJ in this case gave the following reasons for rejecting Dr. Byrnes' assessment:

> Dr. Byrnes' opinion is fraught with self-evident internal inconsistency in stating that the claimant cannot reach or use his hands but can frequently climb ladders, ropes or scaffolds. The notes of the treating surgeon, Dr. Greenberg, and the PT notes give no suggestion of limitation in using the upper extremities other than due to weakness in the shoulders. Good ability to use the hands and fingers was preserved. Even Dr. Byrnes' notes from August 12, 2010 indicate that the claimant had only been having pain in his arms for the past two weeks, which would have been some 9 months after the November 2009 dog attack. Ex. 15F. Similarly, there is no objective evidence to indicate that the abilities to stand/walk or sit are limited in any way. Considering that Dr. Byrnes' opinion is unsupported by the weight of the objective evidence, including his own treatment records, is self-contradictory and is inconsistent with the claimant's daily activities, it is accorded no weight in this decision.

(Tr. 25)

To begin with, Dr. Byrnes' assessment of severely limited upper extremity function is clearly incongruous with his assessment of the ability to frequently climb ladders, ropes, or scaffolds -- so clearly incongruous that it would appear a mistake must have been

12

made in executing the checkbox form. And in fact, Dr. Byrnes did endeavor to remove the internal inconsistency in his opinion highlighted by the ALJ, by way of his subsequent affidavit clarifying that he had intended to impose more significant restrictions on plaintiff's abilities in climbing, balancing, and stooping. (Tr. 218-20) However, that clarifying testimony was not present in the record before the ALJ. Nonetheless, the undersigned would respectfully submit that the assessment form's internal inconsistency is overstated as a reason to assign it no weight.

Moreover, with respect to the ALJ's observation that "Dr. Byrnes' notes from August 12, 2010 indicate that the claimant had only been having pain in his arms for the past two weeks, which would have been some 9 months after the November 2009 dog attack" (Tr. 25), the undersigned finds nothing in this treatment note that would undermine Dr. Byrnes' assessment. The record plainly reveals that plaintiff's significant upper body injuries were reported to Dr. Byrnes on February 9, 2010 (Tr. 328), prompting a referral to the specialist, Dr. Greenberg, the very next day. (Tr. 327) With orthopedic care thus being provided elsewhere, Dr. Byrnes' treatment notes during the rest of 2010 reflect his treatment of other impairments and conditions, such as gout, hypertension, and hyperlipidemia. (Tr. 324-26, 387, 485) The reference in Dr. Byrnes' note of August 12, 2010 to "arm pain x2wks" cannot reasonably be deemed to imply that the pain from plaintiff's shoulder injuries began in that time frame. It is more reasonable to assume that some other, newer variation of arm pain was complained of then, relating to any of a host of potential causes. In any event, the August 12, 2010 treatment note dealt primarily with plaintiff's altered mental status and lethargy, requiring an immediate referral to the emergency room. (T. 387, 485)

13

Nonetheless, the scant attention in Dr. Byrnes' treatment notes to plaintiff's shoulder impairments and shoulder pain speaks to the larger problem with his assessment: it is explicitly based not on his treatment of plaintiff, but on Dr. Greenberg's surgical and followup treatment of plaintiff's shoulder injuries. While the record does not contain a similar assessment from Dr. Greenberg, his treatment notes and the frustrations they describe regarding plaintiff's unavailability for the prescribed amount of physical therapy (occasioned by his refusal to cease work activity), combined with the occasional reference to physical overexertion, loom large in the ALJ's decision to discredit Dr. Byrnes' restrictive assessment along with the subjective complaints voiced by plaintiff. Specifically, those notes, along with the physical therapy progress notes submitted by therapist Brad Bland, describe plaintiff's noncompliance with the prescribed, twice per week schedule of physical therapy appointments, as well as his noncompliance with the home exercise program he was given. Dr. Greenberg also describes plaintiff's frustrating attempts to do chores or work engaging his active range of shoulder motion: "Even looking at his notes he still has done some unusual things with the arm. He has been using a hammer. It sounds like he was trying to dig a fence post or something similar and his understanding of the processes is not ideal. Even Brad has mentioned that he did not work on his passive external rotation because he thought that sweeping the floor would be better." (Tr. 433) Although not specifically mentioned by the ALJ, Mr. Bland's progress notes describe plaintiff's attempts to work (Tr. 452), to drive while holding his cell phone to his ear with his left hand (Tr. 453), and to mow the grass on two occasions with a zero-turn lawnmower, resulting in severe pain from moving the levers on the mower. (Tr. 451) While plaintiff's desire to work at his business and to be active and involved at home are commendable, his disdain for the treatment

approach advocated by his surgeon and physical therapist have contributed to his inability to work in his chosen profession as a mechanic, and constitute substantial evidence supporting the rejection of Dr. Byrnes' restrictive assessment.

Finally, it was clarified at the hearing that plaintiff's alleged difficulties with standing and walking stem from the injury to his shoulders. In particular, plaintiff offered that he could only walk so long before the weight of his arms hanging by his sides caused him pain, and then he had "to prop them on something and let them sit there and rest" (Tr. 57-58, 69); plaintiff does not claim to have any impairment of his lower body that would limit his exertional ability to stand and/or walk. (Tr. 68) Notably, in responding to an agency questionnaire in June 2010, plaintiff estimated that he could walk 1.5 miles before needing to stop and rest for 5-10 minutes. (Tr. 175)

On balance, the undersigned finds that the reasons given by the ALJ for rejecting the opinion of Dr. Byrnes, plaintiff's treating internist, were good and sufficient.

Regarding the ALJ's findings of plaintiff's credibility and his RFC, the undersigned finds substantial evidence supporting those determinations in this case. An ALJ's credibility determination is due considerable deference on judicial review, particularly since the ALJ, unlike the Court, has the opportunity to observe the plaintiff while testifying. E.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). Here, the ALJ recognized that plaintiff "had a very traumatic injury to both shoulders and has objective loss of function as a result" (Tr. 22), assigning a RFC for a reduced range of light work consistent with the limitation to lifting/carrying only 10 pounds, as found by the nonexamining consultant, Dr. Chaudhuri. (Tr. 25) However, substantial evidence on the record as a whole supports the

ALJ's finding that the greater restriction on plaintiff's work-related functional abilities suggested by his testimony and the assessment of Dr. Byrnes is not credible, given the discrepancy between that testimony and the reports of activity, and of noncompliance, contained within the notes of Dr. Greenberg and Mr. Bland.

In sum, the decision of the ALJ is supported by substantial evidence on the record as a whole, and is therefore due to be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 23rd day of February, 2015.

                                                 s/ John S. Bryant
                                                JOHN S. BRYANT
                                                UNITED STATES MAGISTRATE JUDGE